UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RASIDA RAMIC,                          )
                                       )
            Claimant,                  )
                                       )
                                       )        No. 4:13CV2442 AGF-TIA
                                       )
CAROLYN W. COLVIN, Commissioner        )
of Social Security,                    )
                                       )
                     Defendant.        )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an appeal from an adverse ruling by the Commissioner of the Social Security

Administration ("the Commissioner") denying Claimant Rasida Ramic's applications for

disability insurance benefits under Title II of the Social Security Act ('the Act"), 42 U.S.C.

§§ 401 *et seq*., and Supplemental Security Income (SSI) under Title XVI, 42 U.S.C. §§

1381 *et seq*.   Claimant filed a Brief in Support of her Complaint and the Commissioner

filed a Brief in Support of the Answer.   The case was referred to the undersigned for a

report and recommendation pursuant to 28 U.S.C. § 636(b).

I.      **Procedural History**

Claimant, who was born on April 6, 1975, filed her applications for benefits on

April 29, 2010, alleging a disability onset date of February 28, 2010, due to impairments of

her nerves, eyes, and stomach.   Claimant's applications were denied initially, and she

appealed the denials to an administrative law judge ("ALJ").[1]   (Tr. 82-91.)   In response to

Claimant's timely request, the ALJ held a hearing[2] on April 25, 2012.   (Tr. 43-64.)

Claimant appeared with counsel, an interpreter was provided, and the ALJ heard testimony

from Claimant and a vocational expert ("VE").   (Tr. 9, 43-64.)   At the close of the

hearing, Claimant asked for and was permitted to obtain a consultative psychiatric

examination.   Following the May 22, 2012 examination, Claimant requested a

supplemental hearing asserting that the conclusions drawn by the consultative examiner

were "baffling."   (Tr. 9, 284-85.)   In response the ALJ noted that the April 25, 2012

hearing had been thorough and exceeded thirty minutes in length.   The ALJ further stated

that a supplemental hearing would serve no purpose as he had no further questions for

Claimant and her request was based on "erroneous conclusions" regarding the consultative

examination.   (Tr. 9, 286.)   The ALJ then granted Claimant more than six weeks to

provide "factually accurate reasons" that might substantiate the need for a supplemental

hearing.   *Id.*   Claimant failed to respond within the specified time period and the ALJ did

not hold a supplemental hearing.   (Tr. 9-10, 287.)

---

1       Missouri is one of several test states participating in modifications to the disability
determination procedures, which eliminate the reconsideration step in the administrative
appeals process.   *See* 20 C.F.R. §§ 404.906, 404.966, 416.1406, 416.1466. Claimant's
appeal in this case proceeded directly from the initial denial to the ALJ level.

2       Two earlier scheduled administrative hearings failed to reach the merits of Claimant's
case and Claimant failed to appear for a third hearing set for December 12, 2011.   (Tr. 9,
32-34.)   At a February 9, 2012 hearing Claimant appeared with a friend, but her inability
to understand and speak more than a little English necessitated another postponement.
(Tr. 9, 35-42.)

On September 25, 2012, the ALJ issued his decision concluding that Claimant was not under a "disability" as defined in the Act. (Tr. 9-25.) On October 25, 2013, the Appeals Council denied Claimant's request for review. Claimant has thus exhausted all remedies and the ALJ's September 25, 2012 opinion stands as the final decision of the Commissioner subject to judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

On appeal Claimant argues that the ALJ erred in assessing Claimant's Residual Functional Capacity ("RFC") by failing to find that Claimant's diagnosed mental impairment was sufficiently severe to constitute a basis for a finding of disability.

II.     **Application Forms, Work History, Disability and Function Reports**

Claimant noted in her Work History and Disability Reports that she had worked as hotel housekeeper, a poultry cutter and most recently as a self-employed housekeeper. (Tr. 12, 46-47, 160-62, 165, & 172.) No additional information regarding the physical demands of her past work were provided in the Reports. (Tr. 179-183.) The application forms indicate that Claimant was self-employed and earned $16,408.00 in 2010. (Tr. 160.)

In her Function Report dated May 27, 2010, Claimant wrote that she had difficulty sleeping due to chronic pain and needed daily reminders to take her medication. (Tr. 198-199.) She further indicated that because she was unable to concentrate, she could neither clean house nor prepare her own meals and had difficulty driving, frequently becoming lost. (Tr.199-200.) Claimant also indicated that her memory, concentration, understanding and ability to follow instructions were all affected by her symptoms. (Tr.

202.)   She primarily stayed at home, rested, took her medicine, played with her children, and watched television.   (Tr. 197.)   She also wrote that she understood very little English, and was unable to pay bills, count change, handle a savings account or use a checkbook. (Tr. 200.)   Claimant stated that she shopped for groceries once a month and went to church weekly but noted that anxiety made it impossible for her to engage in other activities.

In her Disability Report Claimant wrote that she had completed high school.[3]   (Tr. 171.)   She also reported that she took Citalopram, Laorazepam and Tramadol for her nerves, Hydrocodone with APAP Naproxen for pain, Famotidine for her stomach, "but/apap/cf," for headaches and "belladonna alk" for unknown reasons.   (Tr. 173.)

The record also includes the notes of an agency employee who spoke to Claimant when she filed her applications.   The employee noted that Claimant had not made an appointment, was well dressed and groomed and understood little, if any, English. (Tr. 101-02.)

III.   **Medical Records (Tr. 288-347)[4]**

Claimant was seen on November 29, 2007, at Prince Avenue Primary Care (Prince Avenue) in Athens, Georgia for complaints of stomach pain.   An abdominal ultrasound performed at that time showed no abnormalities.   (Tr. 329.)   On December 5, 2007,

---

3     Claimant later clarified that she had completed only five years of schooling in her native Bosnia.
4     Although Claimant has alleged a disability onset date of February 28, 2010, medical records for the period prior to this time are appropriately considered for background purposes.   *See* 20 C.F.R. § 416.335.

recurring epigastric pain and continued on Prevacid.   (Tr. 347.)

On September 22, 2008, Claimant was seen at Prince Avenue for follow up with respect to gastro-esophageal reflux disease (GERD), and cultured positive for *H. pylori* infection.   Computed tomography ("CT") scans of the abdomen and pelvis showed a hemorrhagic or partially collapsed cyst in the right ovary, mild fatty infiltration of the liver, and fold thickening in the stomach indicating possible gastritis.   (Tr. 328, 346.)   The examining physician concluded that none of these findings required further treatment apart from continued use of Prevacid as necessary.

On October 7, 2008, Claimant was referred to a specialist for a vision checkup after being diagnosed with blurry vision.   (Tr. 352.)

A CT scan of the pelvis performed December 3, 2008, revealed a hemorrhagic collapsed cyst in the right ovary measuring 2.2 cm which was similar to the CT of the pelvis of October 1, 2008, and a possibly new area of cyst or hemorrhagic cyst formation.   (Tr. 324.)

On December 4, 2008, Claimant was seen at Prince Avenue for stomach pain.   (Tr. 345.)   The medical record reflects that that there was a language barrier and that it was difficult for medical professionals to communicate with her.   (*Id*.)   On December 11, 2008, Claimant was seen again at Prince Avenue complaining of headache.   (Tr. 343.)   The treating physician assigned diagnoses of ovarian cyst and sinusitis.   (*Id*.).   A CT of the head performed on that date revealed mild sinus disease involving the left sphenoid sinus, and no other abnormalities.   (Tr. 357.)

On February 18, 2009, Claimant presented with anxiety and difficulty sleeping. March 10, 2009 medical records from Prince Avenue indicate that Claimant presented with chief complaints of headache and nerves, was hyperactive and had a hard time sitting still in the emergency room. (Tr. 392-93.) A CT of the brain performed on that date showed no evidence of acute intracranial abnormality. (Tr. 301.)

On March 18, 2009, Claimant was seen again at Prince Avenue for "bad headaches" for which she had also been to the emergency room. (Tr. 308.) She reported having raging fits in which she had broken dishes. (Tr. 310.) Her physician diagnosed her with chronic unresolving headaches, sinusitis, and anxiety and referred her to a neurologist. (Tr. 308-10.)

Claimant was seen on March 24, 2009 by Dr. Anthony DaCunha, M.D., of Physicians South Neurology for complaints of daily headache located in the back of her head and frontal areas. The headaches were associated with blurry vision, dizziness, nausea and intolerance of light, sound and smell. A CT scan of Claimant's head performed at that time was normal. (290.) In addition, electroencephalograms (EEG), a Visual Evoked Potentials (VEP) study, and a Brain Auditory Evoked Potential (BAEP) study all of which were performed a week later showed normal results. (Tr. 292-94.)

Claimant was seen again on April 3, 2009, at the Physicians South Neurology for headaches. (Tr. 289.) A that time a CT of her head showed no abnormalities and a magnetic resonance image ("MRI") of the brain performed on April 7, 2009 also was normal. (Tr. 291.) Medical records from Physicians South Neurology further indicate

that Claimant was seen on April 13, 2009, for complaints of headache that had lasted about 6 months. (Tr. 288.) The headaches were associated with blurry vision, dizziness, light, sound and smell intolerance and nausea. (*Id*.) An MRI of the brain performed at this time also was normal. (*Id*.)

On April 20, 2009, Claimant saw Dr. Jing Dong to whom she had been referred by Dr. DaCunha for an eye exam and a new eyeglass prescription. (Tr. 95) Claimant complained of blurred vision, both far and near, photosensitivity and numerous headaches in the preceding weeks. (Tr. 295.) After his examination, Dr. Jing Dong noted diagnoses of headache, pingaecula[5] and suspected glaucoma. (Tr. 297.) He patched Claimant's eye for future evaluation and gave her a prescription for eyeglasses. (Tr. 298.) At a follow up appointment on April 25, 2009, Claimant reported continuing problems with her eyes and exhibited symptoms of anxiety. (Tr. 307, 374.) On June 2, 2009, Claimant was seen for new glasses and complaints of left eye pain. (Tr. 305) Dr. Jing Dong noted an increase in Claimant's level of anxiety, prescribed Celexa and approximately one week later increased the dosage. (Tr. 305-306)

October 23, 2009 medical records from St. Mary's Hospital indicate that Claimant presented with nausea, vomiting and complaints of severe cramping pain (10/10). (Tr. 376-378.) On December 7, 2009 Claimant presented with a chief complaint of abdominal pain. (Tr. 364.) Records from this visit indicate that Claimant had miscarried twins in

---

5     A pingaecula is a "common, non-cancerous growth of the clear, thin tissue (conjunctiva)" of the eye. ww.nlm.nih.gov/medlineplus/ency/article/001025.htm.

August of 2009, and had had pain and swelling since that time.   (*Id*.)   A CT of the abdomen revealed no acute difficulties.   At a follow-up appointment in late December of 2009 Claimant's prescriptions for medication were renewed and she was assigned the diagnoses of chronic headache, anxiety and mood disorder.   (Tr. 303.) On January 1, 2010, Claimant was seen at Prince Avenue for complaints of headache. (*Id*.)   She was again diagnosed with headache, anxiety, and mood disorders. (Tr. 304)

A medical certification for Disability Exceptions completed January 2, 2010, indicates that Claimant showed a loss of visual field attributable to neurological rather than ophthalmologic causes. (Tr. 312.)   The certification also reflected that had significantly decreased peripheral vision in both eyes.   (Tr. 313.)

On March 14, 2011, Claimant presented at the Padda Institute, a general medical practice in Saint Louis, where she complained of a 14lb weight loss in the previous seven to eight months, fatigue and a three- day history of productive cough.   Dr. Padda diagnosed an acute upper respiratory infection, prescribed ibuprofen for pain and ordered some diagnostic lab tests.   A thyroid panel and urine culture were normal.   In addition, a complete metabolic panel and complete blood count returned normal values with the exception of a slightly elevated blood urea nitrogen (BUN) and BUN/ creatinine ratio. (Tr. 426-428.)

On April 11, 2011, Claimant again presented at the Padda Institute complaining of vaginal discharge, weight loss and possible urinary tract infection.   The treating physician prescribed Dufulcan, Septra and Vitamin D supplements.   On April 25, 2011, test results

8

showed that Claimant's Vitamin D level was low and that her pap smear normal.   On May 9, 2011, Claimant presented at the Padda Institute for follow up; she had no complaints except for infertility with her current boyfriend, citing her inability to have children since the reversal of tubal ligation.   She was prescribed prednisone and advised to seek a gynecological referral.   On June 2, 2011, Claimant again reported to the Padda Institute complaining of a 10 day history of left flank pain with sharp discomfort but no radiation, hematuria, or increased urinary frequency. An abdominal ultrasound was ordered.   On June 28, 2011, Claimant presented to the Padda Institute complaint of a yellow, odorous vaginal discharge.   The doctor diagnosed vaginitis and vulvovaginitis and prescribed Difulcan.   On July 27, 2011, ultrasound examinations of the abdomen, pelvis and aorta showed no abnormality except for a uterine fibroid.   On September 27, 2011, Claimant reported to the Padda Institute for a follow-up regarding vaginitis and requested that her labs be checked. (Tr. 421.)   She also complained of pelvic discomfort with sharp, stabbing pain one week prior to menses and during her period.   The doctor referred her for gynecological evaluation of the fibroid tumor.   On October 12, 2011, Claimant was seen at Padda Institutes for a follow up exam related to pelvic discomfort and Vitamin D supplementation and again referred for evaluation of the fibroid by her gynecologist.   On October 26, 2011, Claimant was seen at the Padda Institute for complaints of abdominal tenderness, vaginal discharge, and bloating.   Claimant was prescribed Flagyl and Difulcan.

III.    **Evidentiary Hearing (Tr. 47-63.)**

Claimant testified that she came to the United States from Bosnia in 1999 and has a green card. (Tr. 47-48.) She also stated that she received five years of schooling in Bosnia, understands and speaks a minimal amount of English but cannot read and write English. (Tr. 48.) Claimant next testified that when she first came to the United States she lived in Atlanta, Georgia with Mujo Ahmetovic, the father of her children. (Tr. 51, 53-4.) She further testified that approximately two or two and a half years prior to the hearing the family moved from Georgia to St. Louis and that eight or nine months prior to the hearing Mr. Ahmetovic took the children and returned to Georgia without her. (Tr. 53-54.) Claimant further testified stated that Mr. Ahmetovic left her in Saint Louis because "he could not stand to be around" her as she is "a nervous woman." (Tr. 47-54.)

At the time of the hearing, Claimant testified that she lived by herself and was unable to work due to her lack of patience and "all that bothers her." Claimant also testified that she experienced daily headaches which she controls with ibuprofen, consuming a box of ibuprofen every three to four days. (Tr. 48-49.)

Upon questioning by her counsel, Claimant testified that she had been homeless for a short time received $200.00 in food stamps and lived in an unfinished house with no bathroom or heating and only a single tap for running water. (Tr. 50-53.) Claimant testified that she cried daily because of "everything that is in her head," had no contact with her children, but had a friend who sometimes helps her with things including painting her nails. (Tr. 49-51.) Claimant testified that after Mr. Ahmetovic left her, she worked at a

factory for a month, but was fired because she was not pleasant and was not doing a good job.  Claimant also stated that she can write in, but is not good at reading Bosnian, that she does not know English well, and can understand only simple phrases.  Claimant testified that she had begged on the streets for money and asked for donations of clothes from a church.  Claimant testified that due to her living situation she had to use the bathroom facilities at a service station across the street from her building.  She stated that because she had to fill a container with water in order to shower, and she sometimes did not shower for three or four days at a time.  (Tr. 54-55.)

Claimant testified that doctors told her that nerves in her brain were affecting her eyesight because of stress.  Claimant also testified that sometimes she sees black in front of her eyes and feels faint.  She also stated that every two or three days she hears unknown voices and that sometimes the voices are present all the time.  Claimant testified that at times she answers the voice or says, "Hi," and sometimes visits with people who are deceased.  Claimant stated that she had seen a psychiatrist when she lived in Georgia, but has not seen a psychiatrist in St. Louis.  Claimant further testified that she was taking Victorin and ibuprofen.  (Tr. 55-57.)

Upon further examination by the ALJ, Claimant testified that when she was working as a motel housekeeper, a Bosnian co-worker instructed her how to clean the rooms and which rooms to clean because Claimant could not read the employer's instructions sheet providing this information.  Claimant further testified that she was fired

from the housekeeping job because she did not know how to properly clean the rooms. (Tr. 57-58.)

Dr. John McGowan, the VE, testified that a hypothetical claimant posited by the ALJ, a 34 year old woman with less than 12 years of education who has past work as a housekeeper/cleaner and is limited to light work which involves limited communication in English and no need to either read or write English could perform Claimant's past relevant work as a maid hotel/motel. When the ALJ posited that the hypothetical individual was able to understand only simple instructions and perform non-detailed tasks, Dr. McGowan again opined that the individual also would be able to perform the past relevant work as a maid hotel/motel. Finally, when the ALJ added that the hypothetical claimant should not work in constant or regular contact with the general public and should not handle anything more than infrequent customer complaints, Dr. McGowan again testified that the hypothetical claimant could perform the job of hotel/motel maid. (Tr. 59-61.)

Claimant's counsel then posed a hypothetical question to the VE involving a claimant with only a fifth grade education. In response, Dr. McGowan testified that none of his previous answers would change. (Tr. 61-62.) When counsel posited a hypothetical individual who was unable to stay on task longer than fifty per cent of the time, Dr. McGowan then testified that there would be no jobs in the national economy for such an individual. (Tr. 62-63.)

IV.    Consultative Psychological Examination (Tr. 437-39.)

On May 23, 2012, following the hearing, Shannon Davis, Ph.D., a consultative

psychological examiner, ("the CE" or "Dr. Davis") met with claimant and noted that Claimant's appearance and grooming were within normal limits, and that her responses were spontaneous, coherent, relevant and logical. Although the CE gave Claimant only a "fair" grade with respect to her cooperation in the examination, she observed no tangents, flights of ideas, delusions or hallucinations. In addition, the CE found Claimant depressed, reactive and tearful, but noted that she did well at accomplishing her activities of daily living despite the fact that she lived in difficult circumstances. The CE also found that Claimant exhibited adequate attention and appropriate persistence and pace.

The CE diagnosed an adjustment disorder with depressed and anxious mood and concluded that Claimant's mental health symptoms were mild and should not interfere with her ability to maintain gainful employment in a setting commensurate with her abilities. The CE further noted that Claimant's symptoms would likely diminish if she was able to support herself financially and obtain sufficient housing and medical assistance.

V.    **The ALJ's September 25, 2012 Decision (Tr. 9-23.)**

After careful consideration of the entire record, the ALJ found that Claimant, who was 37 years old at the time of the decision, met the requirements for insured status through December 31, 2014, and thus that Claimant would be required to establish disability on or before that date. (Tr. 10.)

In light of Claimant's reported self-employment earnings of $16, 508 for 2010,[6]

(Tr. 16-66), the ALJ determined that Claimant had engaged in substantial gainful activity

after February 28, 2010, the alleged onset date, through December 31, 2010.   (Tr. 12-13.)

Nonetheless, the ALJ also found that there had been a 12-month period beginning January

1, 2011, during which Claimant did not engage in substantial gainful activity.   (*Id.*)

At Step 2, the ALJ concluded that Claimant had the following medically

determinable impairments: headache, pinguecula, suspect open-angle glaucoma, Vitamin

D deficiency, vaginitis, uterine fibroids, GERD, and adjustment disorder with depression

and anxiety, alternatively diagnosed as anxiety and a mood disorder.   (Tr. 13.)   The ALJ

found, however, that Claimant did not have an impairment or combination of impairments

that significantly limited her ability to perform basic work activities[7] for twelve

---

6      Although Plaintiff alleged disability beginning February 28, 2010, the record shows
that she actually worked for the next ten months, making her ineligible for disability
benefits for the balance of 2010.   (Tr. 12-13, 160, 162, 165.)   Plaintiff reported
self-employment earnings totaling $16,508 in 2010, which averages to over $1,300 per
month (Tr. 12, 160, 162, 165). These earnings correspond to average monthly earnings in
excess of the $1000 threshold indicative of substantial gainful activity for the year 2010.
(Tr. 13.)   If an individual's monthly earnings exceed a given amount, she is deemed to
have performed substantial gainful activity during that period (Tr. 12-13). *See* 20 C.F.R. §§
404.1574(a)(1), 416.974(a)(1).   Therefore, Plaintiff had the burden to prove that, because
of one or more mitigating factors, her 2010 earnings did not constitute substantial gainful
activity (Tr. 12).
7      The "basic work activities" identified in Social Security Ruling (SSR) 85-28
are:
        walking, standing, sitting, lifting, pushing, pulling, reaching, carrying,
        or handling; capacities to see, hear and speak; understanding, carrying
        out, and remembering simple instructions;, use of judgment;
        responding appropriately to supervision, co-workers, and usual work
        situations; and dealing with changes in routine work setting.

consecutive months. (Tr. 14-23). In the absence of such a limitations, the ALJ further found that Claimant did not have a severe impairment of combination of impairments as defined at 20 CFR§ 404.1521 *et. seq*.

With respect to the eye problems alleged as a basis for disability, the ALJ noted that in April 2009, well before the asserted disability onset date, Claimant was examined for complaints of blurred vision and photosensitivity. Although Claimant exhibited some visual field loss attributable to neurologic rather than ophthalmologic impairment, the ALJ opined that the medical evidence indicated that the visual field loss did not affect Claimant's ability to see or read objects in front of her. In addition, the ALJ concluded that the diagnosis of "suspected glaucoma" indicated the possibility that Claimant might develop glaucoma but did not demonstrate vision loss or nerve damage. The ALJ stated that there was no evidence that the alleged visual impairments limited Claimant's ability to engage in any basic work activity. The ALJ further noted that Claimant suffered from these eye impairments in 2010 when she had engaged in substantial gainful activity and that the she had not complained of vision problems during her numerous medical visits in 2011. In addition, the ALJ noted that the record did not support a finding that the impairments of pinguecula, visual field loss, or suspect glaucoma had lasted at least twelve consecutive months as required to be deemed "severe" under 20 CFR §§404.1509 and 416.909.

---

SSR 85-28.

With respect to Claimant's stomach complaints, the ALJ found that the record supported a determination that Claimant has a history of GERD and at one time received a diagnosis of gastritis, but found no objective medical evidence that the gastritis persisted after October of 2008. The ALJ noted that the abdominal tenderness identified in 2011 was attributed to gynecological problems and concluded that Claimant had not met her burden to demonstrate that this impairment had more than a *de minims* effect on her ability to perform basic work activities.

With respect to the alleged gynecological impairments, the ALJ found them to be non- severe because they failed to meet the 12 month durational requirement. Noting that the record indicated that Claimant was diagnosed with and treated for vaginitis and uterine fibroids from April 2011 through October 2011, the ALJ found no objective medical evidence of diagnosed genitourinary conditions after that date. (Tr. 15-16.)

Although Claimant testified that she experienced daily headaches for which she took daily ibuprofen, the ALJ concluded that the objective medical evidence showed a history of headache dating from early 2009 when Claimant had an extensive neurological work up for this symptom. He noted that neurological examinations in 2009 and 2011 failed to reveal any abnormality. In addition, he found no indication that Claimant had been prescribed any medication for headache since early 2009 and very little evidence that the headaches have more than a minimal effect on her ability to perform basic work activities. Therefore, the ALJ concluded that Claimant failed to satisfy her burden of proof with respect to the nature and severity of headache as an impairment.

16

The ALJ found that a vitamin D deficiency was detected and treated with supplements in 2011, but that Claimant had not alleged a disability arising from her low Vitamin D levels and that the medical evidence does not establish that the deficiency lasted for at least twelve consecutive months. Therefore the ALJ concluded that the evidence related to the alleged Vitamin D deficiency also failed to demonstrate the required severity.

The ALJ further noted that he gave little weight to the opinion of Dr. Jing Dong who opined that Claimant retained sufficient central vision functioning to read and learn and had no impairment that affected her ability to read, speak or write English. Noting that the opinion was limited in scope and rendered approximately eight months after Dr. Jong's single examination of Claimant, the ALJ concluded that the opinion should be afforded little weight as it was neither timely nor probative. (Tr. 16-17.)

Noting that the Claimant had a medically determinable mental impairment, the ALJ considered the four functional areas necessary for a proper assessment of mental impairments. (Tr. 17.) The ALJ also applied the special technique for evaluating mental impairments found at 20 C.F.R. pt. 416.920a and determined that Claimant did not have the mental impairments that satisfy the criteria of Paragraph A of the listing. The ALJ found only mild limitations in the Paragraph B criteria: activities of daily living, social functioning, concentration, persistence and pace. (Tr. 17-18.) Finally, the ALJ determined that the record was devoid of evidence satisfying the criteria of Paragraph C, such as repeated or extended episodes of decompensation, or residual psychiatric issues that might be exacerbated by even a minimal increase in mental demands. (Tr. 18.) On

17

the basis of the foregoing, the ALJ concluded that the Claimant had not been under a disability from February 28, 2010, through the date of his decision.

VI.   **Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court "must review the entire administrative record to 'determine whether the ALJ's findings are supported by substantial evidence on the record as a whole." *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011).   The court "'may not reverse . . . merely because substantial evidence would support a contrary outcome.   Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion." *Id.* (citations omitted); *see also Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (explaining that the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal by the reviewing court).   If "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." *Wheeler v. Apfel*, 224 F.3d 891, 894-95 (8th Cir. 2000); *see also Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008) (holding that the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted)). Nevertheless, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; [courts] also take into account whatever in the record fairly detracts from that decision." *Beckley*

*v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998).

To be entitled to benefits, a claimant must demonstrate an inability to engage in substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months, 42 U.S.C. § 423(d)(1)(A), and the burden is on the claimant to prove that he or she has a disability. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied.

If not, the Commissioner decides at Step Two of the sequential evaluation process,

an ALJ considers whether the claimant has a medically determinable impairment or a combination of impairments that is "severe." *See* 20 C.F.R. §§ 404.1520(a)(ii), (c); 416.920(a)(ii), (c). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 20 C.F.R. §§ 404.1521(a) & 416.921(a). In other words, if the impairment has only a minimal effect on the claimant's ability to work, then the impairment is not severe. *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007). To qualify for disability benefits, it is Claimant's burden to establish that she has a severe impairment. *See Kirby*, 500 F.3d at 707.

A special technique is used to determine the severity of mental impairments. This technique calls for rating the claimant's degree of limitation in four areas of functioning: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. *See* 42 C.F.R. §§ 404.1520a(c)(3) & 416.920a(c)(3). If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied.

If, however, the impairment is severe and satisfies the duration requirement, the Commissioner determines at Step Three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in the Social Security regulations. If not, the Commissioner asks at Step Four whether the claimant has the RFC to perform her past relevant work as she performed it or as it is generally performed in the national economy. If so, the claimant is not disabled.

If the claimant cannot perform her past relevant work, the burden of proof shifts at Step Five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors -- age, education, and work experience. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).

In reviewing the Commissioner's decision, a district court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.
2. The claimant's vocational factors
3. The medical evidence from treating and consulting physicians.
4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
5. Any corroboration by third parties of the claimant's impairments.
6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).   In addition, when the Appeals Council "has considered new and material evidence and declined review, [the court] must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence." *Gartman v. Apfel*, 220 F.3d 918, 922 (8th Cir. 2000) (internal quotation omitted).

VII.  **Discussion**

Notably, although the ALJ found that Claimant's allegations of physical and mental impairment lacked credibility, Claimant does not challenge these credibility

determinations.   (Tr. 14-23).   In addition, Claimant offers no arguments related to the ALJ's findings with respect to the severity of her alleged physical impairments.   *See* Pl.'s Br. at 11-12.

Rather Claimant argues that the ALJ erred in finding that Claimant's mental impairments were not severe.   Specifically, Claimant points to her testimony that she lost her job at the factory because she was not pleasant, that Mr. Ahmetovic left her because she is a nervous woman, that she was fired from her housekeeping jobs because she did not know how to properly clean the rooms, and that she did not go to the doctor because she was nervous.   Claimant also argues that her testimony is supported by medical records from her treating physician at the Prince Avenue Clinic in Georgia, indicating a diagnosis of an anxiety and mood disorder, Claimant's reports to the doctor that she had difficulty sleeping and experienced raging fits which caused her to break dishes.   She further relies on records from the visit to the St. Mary's Hospital emergency room indicating that she had a hard time sitting still in the emergency room and was hyperactive.   Finally, Claimant notes that at the consultative psychological examination, she reported being physically abused while in a concentration camp for a month during the Bosnian War and the CE noted a depressed mood and reactive, tearful affect.

On the basis of this evidence, Claimant argues that the diagnosed mental impairment significantly limits her ability to use judgment, respond appropriately to supervision and co-workers in work situations and deal with changes in the work and therefore constitutes is a severe impairment.

Upon review of the record the Court first notes that consistent with the applicable regulations and case law, the ALJ discounted Claimant's testimony as not entirely credible. Specifically with respect to her mental impairment, the ALJ noted that Claimant received minimal and conservative treatment for her allegedly disabling impairments, that there were inconsistencies between Claimant's testimony and other evidence of record that tended to show that she exaggerated the severity of her symptoms. *See* (Tr. 12-13, 15-18, 20-22); s*ee also Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004) (holding that an ALJ may disbelieve a claimant's subjective reports because of inherent inconsistencies or other circumstances). For example, despite her assertions that she had serious difficulties with most aspects of daily living, Claimant did not raise that issue with any of her treatment providers, and the CE concluded that she could care for her personal needs without difficulty. (Tr. 17, 198-202, 439.) Similarly, Plaintiff alleged significant limitations in social functioning, but she has not presented any evidence suggesting she has trouble being in public or around groups of people, and she displayed good eye contact and a cooperative attitude at the hearing. *See* (Tr. 17-18, 201-02.); s*ee also Johnson v. Apfel*, 240 F.3d 1145, 1147-48 (8th Cir. 2001) (noting that "[t]he ALJ's personal observations of the claimant's demeanor during the hearing [are] completely proper in making credibility determinations"). In addition, the ALJ also noted that Claimant had never been hospitalized for mental problems, nor had she experienced any discrete periods of worsening mental health. *See Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006) (upholding an ALJ's determination a claimant lacked credibility due in part to "absence of

23

hospitalizations . . . limited treatment of symptoms, [and] failure to diligently seek medical care"); *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (finding that conservative treatment reduced the claimant's credibility). For these reasons the Court is satisfied that the ALJ pointed to substantial evidence in the record supporting his credibility determinations and thus that the Court should defer to those determinations. *See Perkins v. Astrue*, 648 F.3d 892, 900-01 (8th Cir. 2011).

The Court next concludes that ALJ conducted the appropriate analysis for determining the severity of mental impairment and properly found that Claimant's mental impairments did not significantly limit her ability to perform basic work activities. Moreover, Claimant—who bears the burden of establishing a severe impairment—has cited neither credible evidence supporting an opposite conclusion nor legal authority for her position.

Using the "special technique" set out in 20 C.F.R. §§ 404.1520a and 416.920a, the ALJ considered the following four functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *See id*. §§ 404.1520a(c)(3), 416.920a(c)(3). A mental impairment is not deemed "severe" if it results in no more than mild limitations in the first three functional areas and no limitations in the fourth area. *See id*. §§ 404.1520a(d)(1), 416.920a(d)(1).

Here, the ALJ determined that Claimant had the medically determinable mental impairment of adjustment disorder with depression and anxiety, alternately diagnosed as anxiety and mood disorder. (Tr. 13). After considering the four functional areas

24

discussed above, the ALJ found that these impairments were non-severe. (Tr. 17-18).

Upon review the Court is satisfied that the ALJ's decision is supported by substantial

evidence, including the CE's report completed in May 2012. (Tr. 17-18, 437-43.)

The ALJ first determined that Claimant was only mildly limited in activities of daily

living. (Tr. 17.) The ALJ noted that during her consultative exam in May 2012,

Claimant reported despite a difficult housing situation that she visited the park, tried to

clean her living quarters and was appropriately groomed and dressed. The ALJ further

relied on the CE's opinion that Claimant had the mental capacity to take care of her own

personal needs. (Tr. 17, 437, 438-39.) In addition, Claimant's testimony that she

received clothes from a local church, and had learned ways to wash and otherwise care for

herself despite living in poverty further support the ALJ's determination that Claimant was

no more than mildly limited with respect to the activities of daily living. (Tr. 50-51,

54-55.) Further, during the relevant period, Claimant never reported any difficulty with

activities of daily living to her treatment providers. (Tr. 17.)

The ALJ further determined and the record supports a determination that Claimant

suffered no limitations in social functioning. (Tr. 17-18.) Although in May 2012,

Claimant claimed to have no social contacts, there is no indication in the record that any

mental impairment caused her claimed lack of contacts. (Tr. 17, 437.) Moreover,

medical records indicate that Claimant had a long-term romantic relationship during the

relevant period, (Tr. 17, 419, 426), and she testified about another friendship. (Tr. 17, 53,

55.) In addition, the ALJ found that the record included no credible evidence that

Claimant suffered from irritability, mood swings, or paranoia. (Tr. 18.) And the CE opined that Claimant's abilities to interact appropriately with supervisors, co-workers, and the general public, and to adjust to changes in work routines, were not limited by her mental impairment. (Tr. 18, 442.)

Similarly, the ALJ concluded that Claimant had no functional limitations with respect to concentration, persistence, or pace. (Tr. 18.) Although Claimant alleged that she was unable to concentrate well enough to cook, drive, or handle money, and that she had trouble following instructions, the record contains no evidence that Claimant ever complained to treating or consulting care givers of impaired attention, concentration, or memory during the relevant period, nor any objective evidence of abnormalities in any of those areas. (Tr. 18, 199-202.) The CE found that Claimant had no apparent problems with short- or long-term memory, and that she exhibited no tangents, flight of ideas, or perseveration in her thought processes. (Tr. 18, 438-39.) As a result, the CE concluded that Claimant could maintain adequate attention and concentration, with appropriate persistence and pace, and the ALJ agreed. (Tr. 18, 439.) Finally, the ALJ found that Claimant had never suffered any, let alone extended, episodes of decompensation. (Tr. 18.)

For these reasons the Court is satisfied that the substantial evidence of record supports the ALJ's finding that Claimant's mental impairments were not severe. *See Buckner*, 646 F.3d at 556-57 (indicating that depression is not necessarily disabling and that mild limitations in the first three functional areas with no episodes of decompensation

supported the ALJ's finding that the claimant's mental impairments were not severe). The ALJ's assessment of Claimant's functional abilities is supported by the medical opinion of the CE, Dr. Davis, who conducted a psychological consultative examination just a few weeks after Claimant's hearing. (Tr. 17-18, 437-43.) Because the ALJ found that the CE's opinion was based on a thorough examination and review of some of Claimant's medical records; was consistent with other evidence of record; and was the only opinion evidence from a treating or examining source regarding Claimant's mental impairment and limitations, the ALJ properly gave the CE's opinion great weight. (Tr. 19).

Dr. Davis diagnosed Claimant with adjustment disorder with depressed and anxious mood, noting that her unemployment, limited education, and inability to speak English were prominent psychosocial and environmental issues that impacted her condition. (Tr. 439.) She further opined that Claimant's prognosis was fair, and that she would benefit from job and language training, as well as housing and medical assistance. (*Id*.). Thus, the CE acknowledged that Claimant's difficulties were due only in small part to her medically determinable impairments, and instead were largely caused by factors such as her living situation which fell outside the scope of factors addressed by the disability benefits system.

The record indicates that the CE assigned Claimant a Global Assessment of Functioning (GAF) score of 55, and had concluded that Claimant's "mental health symptoms appear mild and would not interfere with her ability to maintain gainful employment." (Tr. 18-19, 439.) Claimant argues that her GAF score of 55 reflected that

she had a severe mental impairment, but her reliance on the assigned GAF score is misplaced.[8]

First, the GAF score the CE assigned to Claimant reflected only moderate symptoms or difficulty in social and work settings, and therefore supports the ALJ's determinations. Thus, this is not a case where Claimant's GAF score was so low that it undermined the ALJ's own determination that the evidence failed to show the required severity.

In addition, the GAF scale was developed for use in clinical, educational, and research settings to assist practitioners in making treatment decisions; it is not an assessment of an individual's ability to work. *See* DSM–IV–TR at 31–33; *Quaite v. Barnhart*, 312 F. Supp. 2d 1195, 1200 (E.D. Mo. 2004). And the Commissioner has declined to endorse the GAF scale for use in Social Security and SSI disability programs, and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders listings." *See* 65 Fed. Reg. 50746, 50764-65, 2000 WL 1173632 (August 21, 2000); s*ee also Halverson v. Astrue*, 600 F.3d 922, 930–31 (8th Cir. 2010) (recognizing that a GAF score is simply one factor that an ALJ may rely upon in assessing a claimant's mental impairments). Therefore, a GAF score, standing alone, does not

---

8      Some clinicians use the GAF scale to assess a patient's level of psychological, social, and occupational functioning. *See* Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. text revision 2000). A GAF score of 51-60 indicates "moderate" symptoms or difficulty in social, occupational, or school functioning. (e.g., flat affect and circumstantial speech, occasional panic attacks, few friends, and conflicts with peers or co-workers). *See id.*

establish the presence of a severe impairment.   Here the ALJ properly considered the entire record in determining that Claimant's mental impairments were not severe and considered the GAF score in the context of the entire record.   In so doing, the ALJ also based his finding on the medical opinions of record and treatment notes from Claimant's providers.   *See Jones v. Astrue*, 619 F.3d 963, 974 (8th Cir. 2010) (holding that an ALJ may afford greater weight to medical evidence and testimony than to GAF scores); *Grim v. Colvin*, No. 4:12CV01576 AFG, 2014 WL 859840, at *7-8 (E.D. Mo. Mar. 5, 2014) (stating that the ALJ properly found that the claimant's mental impairments were not severe despite the presence of GAF scores that reflected moderate and serious symptoms).

Finally, the Court concludes that record and the applicable law support the ALJ's determination that although Claimant reportedly lives in "significantly adverse circumstances" which "likely impede her ability to obtain employment," these circumstances alone cannot, without evidence of a severe impairment, form the basis for a finding of disability.   (Tr. 22.)

VIII.   **Conclusion**

In sum, the ALJ's finding that Claimant's mental impairments were not severe is supported by substantial evidence on the record as a whole. Claimant, who bears the burden of proving a severe impairment, cites no credible evidence to the contrary.   The ALJ's determination is supported by substantial evidence on the record and displays proper consideration of credibility issues and the severity of alleged mental impairment.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying Claimant's applications for disability insurance benefits and SSI payments under the Act be **AFFIRMED.** The parties are advised that they have fourteen days in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990).

*/s/ Terry I. Adelman*
TERRY I. ADELMAN
UNITED STATES MAGISTRATE
JUDGE

Dated this 13th day of January, 2015.